Matthew SIMON, Plaintiff–Appellant,

v.

**SAFELITE GLASS CORPORATION,**
**Defendant–Appellee.**

**No. 1769, Docket 96–9558.**

United States Court of Appeals,
Second Circuit.

Argued June 10, 1997.

Decided Oct. 14, 1997.

Joel Field, New York City, for Plaintiff–Appellant.

Peter D. Stergios, New York City (Michelle Lewis Ramirez, Epstein, Becker & Green, on the brief), for Defendant–Appellee.

Before: OAKES and PARKER, Circuit Judges, and NICKERSON, District Judge.*

NICKERSON, District Judge:

Plaintiff Matthew Simon appeals from a judgment of the United States District Court for the Eastern District of New York, I. Leo Glasser, *Judge,* dismissing plaintiff's complaint alleging that defendant Safelite Glass Corp. (Safelite) discriminated against him because of his age in violation of the Age Discrimination in Employment Act (the Age Discrimination Act), 29 U.S.C. § 626(c)(1), and the New York State Human Rights Law, N.Y. Exec. Law § 290.

The complaint, filed April 20, 1994, alleged that Safelite terminated and refused to rehire plaintiff because of his age although he had satisfactorily performed his duties, and hired younger persons for positions that plaintiff was "fully qualified" to fill.

On January 15, 1996, Safelite moved for summary judgment urging that plaintiff could not establish a prima facie case of age discrimination. Judge Jack B. Weinstein, then presiding over the case, denied the motion without opinion. The case was reassigned to Judge I. Leo Glasser, and trial was scheduled to commence on February 12, 1996.

On that day Safelite told Judge Glasser that it had just been informed that on February 14, 1994, two months before filing the complaint, plaintiff applied for Social Security disability benefits, which were awarded three days later. Plaintiff remained silent about this information for almost two years, only disclosing these facts to Safelite a few days before trial was to begin. Judge Glasser directed the parties to conduct further discovery and granted Safelite leave to renew the motion for summary judgment.

On October 28, 1996 Judge Glasser granted Safelite's motion for summary judgment, declaring that plaintiff was "the paradigmatic judicial estoppel plaintiff." 943 F.Supp. 261, 264 (E.D.N.Y.1996). He ruled that plaintiff's representations in his application for Social Security disability benefits that he was "disabled" and "became unable to work" because of "his disabling condition" estopped him from claiming under the Age Discrimination Act he was not disabled, but fully qualified to hold his previous job. *Id.*

## I

■ In order to prevail in an action under the Age Discrimination Act plaintiff is required to show, among other things, that he "was qualified to perform the duties required by the position" in question. *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 508 (2d Cir.1994) (quoting *Levin v. Analysis & Tech., Inc.,* 960 F.2d 314, 316 (2d Cir. 1992)).

The Social Security Act provides, in relevant part, that a person shall be deemed to suffer from a disability only if his impairments are so severe that "he is not only unable to do his previous work," but also "cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The regulations issued under the Social Security Act spell out the steps those administering the Act are to take in evaluating whether a person is "disabled." Section 404.1520 of 20 C.F.R. provides, in pertinent part, the following: To be disabled the person must not be engaged in substantial gainful activity and must have a severe impairment; if the impairment is medically so severe as to meet or equal an impairment "listed" in the regulations, the person will be found disabled without consideration of his work experience; but if the impairment does not meet or equal one listed, the person will be found not disabled unless it prevents him from doing the work he has "done in the past." As Section 404.1520(e) puts it, "If you can still do this kind of work, we will find that you are not disabled."

In his signed application of February 14, 1994 for disability payments, plaintiff stated

* The Honorable Eugene H. Nickerson of the United States District Court for the Eastern District of New York, sitting by designation.

that "I became unable to work because of my disabling condition on March 31, 1993," that "I am still disabled," and that "I agree to notify" the Social Security Administration if "my medical condition improves so that I would be able to work" or if "I go to work whether as an employee or a self-employed person."

The final paragraph of the application reads: "I know that anyone who makes or causes to be made a false statement or representation of material fact in an application or for use in determining a right to payment under the Social Security Act commits a crime punishable under federal law by fine, imprisonment or both. I affirm that all information I have given in connection with the claim is true."

On April 23, 1994, three days after the complaint was filed in court, the Social Security Administration notified plaintiff that it had found, "based on information you gave us," that he "became disabled" on March 31, 1993, and would receive around April 28, 1994 a lump sum payment of $5,230 for back benefits and thereafter $757 each month. Plaintiff has been receiving benefits ever since and has never reported to the Social Security Administration that he was able to do his prior work or any other work, despite the fact that after starting to receive disability benefits. he did obtain occasional employment.

The question for decision is whether plaintiff, having received Social Security benefits based on representations under penalties' of perjury that he had become "unable to work because of my disabling condition," may now claim that he was and is able to do this prior work.

II

Plaintiff's Social Security file shows the following.

On February 14, 1994, he was given a form to fill out headed "Disability Report." Plaintiff wrote his name and social security number and recorded his job as "auto glass installer." In the box headed "What is your disabling condition? (Briefly explain the in-jury or illness that stops you from working)," plaintiff wrote "can't see."

The balance of the Disability Report is, as plaintiff concedes, in the handwriting of the person who interviewed him for the Social Security Administration. After plaintiff's statement "can't see," the interviewer wrote "both eyes (right eye more severe)." In the part headed "for SSA Use Only" she indicated that plaintiff had problems seeing and hearing. In the box headed "Describe the exact difficulty involved" she wrote: "Problems with vision and hearing were evident. Claimant held forms close to his eyes to read before signing. When questions were asked, Mr. Simon leaned forward to hear. Interviewer made sure questions were asked loud enough to hear."

Plaintiff's answers to the questions on the Disability Report as they were recorded by the interviewer showed that his "condition" first bothered him in mid–1992, that he continued to work after that date, and that his "condition" caused him to change the circumstances of his work. In explaining the "changes," the interviewer recorded his answer as: "I had to wear my eye bandaged for a while (results of injury-glass in my eye). I stayed out on sick leave at times—was finally laid off—reduction in force."

In answer to the question "When did your condition finally make you stop working?," plaintiff's recorded response was "March 31, 1993." Box 3B directs "Explain how your condition now keeps you from working." Plaintiff's response, as recorded, was: "I was laid off in 3/93 but I have not been able to do any additional work because my vision is getting worse. I have a blurriness—not painful but is annoying. I cannot see to do any detail work."

A section of the Disability Report asks for information "about the work you did." Plaintiff's pertinent recorded answers state that his job title was auto glass installer in the automobile business; that he used machines, tools or equipment; and that he wrote, completed reports, or performed similar duties. In describing his basic duties as an auto glass installer he stated: "I disassembled the doors, wipers etc. and cleaned out old glass. Carefully prepared car for new glass making

sure not to scratch car. I made out bills to customer occasionally. I help new employees learn the job." Simon also stated that he "[p]reviously did some locksmith work but color coding requirements became impossible with [his] vision loss."

In a section of the Disability Report requesting "any additional information that you think will be helpful in making a decision in your disability claim," plaintiff's recorded statement was: "I was told by Dr. Fromer, I could expect no improvement because of my age—there is no treatment to change the reduction in vision. I am also having a hearing problem—my hearing has also deteriorated recently. I have not been tested."

On February 14, 1994, the day that the Disability Report was completed, plaintiff also signed the application for disability benefits, referred to above, swearing that he "became unable to work because of my disabling condition" on March 31, 1993 and was "still disabled," and that he agreed to notify the Social Security Administration if his "medical condition improves so that I would be able to work."

On March 25, 1994 plaintiff was referred to Dr. S. Doro for a consultant's eye examination. The doctor reported that the plaintiff had "peripapillary atrophy in both eyes" and "high myopic chorioretinal changes in both." The doctor concluded that (1) plaintiff had "high myopia and myopic chorioretinal degeneration," and (2) "S/P retinal artery occlusion of the right eye." Plaintiff's visual acuity without glasses in the right eye was 20/400 and in the left 20/70. His visual acuity "best corrected" was 20/100 in the right eye and 20/30 in the left.

Dr. Doro's report and that of Dr. Carl Fromer, plaintiff's treating doctor, were referred on April 6, 1994 to a Dr. Opthal for comment on the severity of plaintiff's visual impairment. A doctor whose signature is illegible made a written report on that date stating the "impairment does not meet or equal listing," and "[s]light visual impairment fine visual tasks."

The file was then referred on April 13, 1994 to a vocational consultant with a form entitled "Request for Vocational Assistance" asking for advice and stating that Simon's "work required close vision and using tools." The report of the vocational consultant stated that plaintiff's job of auto glass installer "is medium, semi-skilled & requires frequent use of near vision & depth perception," that plaintiff "cannot perform his past work," that "competitive work even at an unskilled level requires sufficient vision to avoid hazards," and that plaintiff's "remaining occupational base is extremely small." The report concluded that, all things considered, "a finding of disabled is in order."

Ten days later, on April 23, 1994, the Social Security Administration sent plaintiff the notice referred to above reciting that it had decided he was disabled "based on information you gave us," and advising him of the amount of the benefits he would receive.

### III

■■■ Judicial estoppel prevents a party in a legal proceeding from taking a position contrary to a position the party has taken in an earlier proceeding. *Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1037–38 (2d Cir. 1993). As this court explained in *Bates,* judicial estoppel serves interests different from those served by equitable estoppel, which is designed "to ensure fairness in the relationship between parties." *Id.* at 1037, quoting *Konstantinidis v. Chen,* 626 F.2d 933, 937 (D.C.Cir.1980). The courts invoke judicial estoppel as a means to "preserve the sanctity of the oath" or to "protect judicial integrity by avoiding the risk of inconsistent results in two proceedings." *Bates,* 997 F.2d at 1038.

A court could, of course, uphold the sanctity of the oath by applying estoppel to prohibit a litigant from asserting under oath inconsistent positions in two proceedings even when there is no risk of an inconsistent outcome. Indeed, in the case that first announced the doctrine of judicial estoppel there was no threat of a result inconsistent with an earlier proceeding; instead, the court based its reasoning entirely on its desire to preserve the sanctity of the oath. *Hamilton v. Zimmerman,* 37 Tenn. (5 Sneed) 39 (1857).

Some courts have estopped a litigant from asserting facts inconsistent with statements

in a prior proceeding that resulted in a settlement. *See e.g., Rissetto v. Plumbers & Steamfitters Local·343*, 94 F.3d 597, 604 (9th Cir.1996) ("obtaining a favorable settlement is equivalent to winning a judgment for purposes of applying judicial estoppel"); *Kale v. Obuchowski*, 985 F.2d 360, 361–62 (7th Cir. 1993).

But this court in *Bates* decided that estoppel only applies when a tribunal in a prior proceeding has accepted the claim at issue by rendering a favorable decision. 997 F.2d at 1038. *See also AXA Marine & Aviation·Ins. (UK) Ltd. v. Seajet Indus. Inc.*, 84 F.3d 622, 628 (2d Cir.1996); *City of Kingsport v. Steel & Roof Structure, Inc.*, 500 F.2d 617, 620 (6th Cir.1974); *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1428 (7th Cir.1993); *United States v. 49.01 Acres of Land*, 802 F.2d 387, 390 (10th Cir.1986); *Konstantinidis*, 626 F.2d at 939. By adopting a rule that requires acceptance by the earlier tribunal of the litigant's statements, this court limits the doctrine of judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity is certain. *Bates*, 997 F.2d at 1038.

Plaintiff argues that estoppel should not be applied because even if his statements to the Social Security Administration were deliberately false, they were made in an administrative, not a judicial, forum.

Numerous decisions have approved the application of judicial estoppel where the prior statements were made in administrative or quasi-judicial proceedings. *See, e.g., Rissetto*, 94 F.3d at 604; *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1427 (7th Cir. 1993); *Smith v. Montgomery Ward & Co.*, 388 F.2d 291, 291 (6th Cir.1968). In fact, many courts have precluded litigants from advancing positions contrary to statements made in applications for Social Security disability benefits. *See, e.g., Cline v. Western Horseman, Inc.,·* 922 F.Supp. 442 (D.Colo. 1996); *Simo v. Home Health & Hospice Care*, 906 F.Supp. 714 (D.N.H.1995); *Muellner v. Mars, Inc.*, 714 F.Supp. 351 (N.D.Ill. 1989).

To rule otherwise might leave the implication that someone who feels himself in need of further income is free to misrepresent important information to the Social Security Administration. Ascertaining the truth is as important in an administrative inquiry as in judicial proceedings. *Rissetto*, 94 F.3d at 604. A growing number of disputes are adjudicated before administrative agencies and tribunals, and those proceedings often form the factual record for later appeals to a judicial court. Moreover, Social Security disability determinations are, in essence, adjudicative. Uniform regulations govern the application process, *see* 42 U.S.C. § 421(k)(1), and claimants are entitled to procedural due process under the provisions of the Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706.

That such proceedings are not always conducted under formal oath is unimportant. Claimants affirm that the information they give is true, and they sign the application, as did plaintiff, under penalty of perjury. What is important is that the record reflect that the party "intended the·triers of fact to accept the truth of the facts alleged in support of the [party's] positions." *Muellner*, 714 F.Supp. at 357·(quoting *Department of Transp. v. Coe*, 112 Ill.App.3d 506, 510–11, 68 Ill.Dec. 58, 60, 445 N.E.2d 506, 508 (4th Dist.1983)).

Plaintiff's citation of *Stella v. Graham–Paige Motors Corp.*, 259 F.2d 476, 481–82 (2d Cir.1958), and *Harney v. William M. Moore Bldg. Corp.*, 359 F.2d 649 (2d Cir.1966), is not· on point. In *Stella* the statements in a Securities Exchange Commission proxy statement were published "in the regular course of the business" of the defendant corporation and constituted "opinions" that "did not purport to be statements of demonstrative facts within the knowledge" of the corporation. 259 F.2d at 482. In *Harney* there was no award in administrative proceedings. 359 F.2d at 652.

■ The fact that plaintiff made·his sworn statement in an administrative proceeding does not exempt him. from application of the doctrine of judicial estoppel.

■ Because judicial estoppel is invoked to protect the integrity of the judicial process from the threat of inconsistent results, there must be·a true inconsistency between the

statements in the two proceedings. If the statements can be reconciled there is no occasion to apply an estoppel. *AXA Marine & Aviation Ins. (UK) Ltd.*, 84 F.3d at 628; *see also In Re Brody*, 3 F.3d 35, 39 (2d Cir.1993); *Desjardins v. Van Buren Community Hosp.*, 37 F.3d 21, 23 (1st Cir.1994).

█ The same may be said when the first statement was the result of a good faith mistake, *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir.1996); *John S. Clark Co. v. Faggert & Frieden, P.C.*, 65 F.3d 26, 29 (4th Cir.1995), or an unintentional error. *Konstantinidis*, 626 F.2d at 939–40.

## IV

All the preconditions for the application of judicial estoppel are present in this case.

█ Plaintiff made statements under penalty of perjury to the Social Security Administration that he was "unable to work." Those statements are patently and admittedly contrary to his central claim in this case that he is able to work. The Social Security Administration granted plaintiff benefits "based on" his statements. The assertions in this case and in the administrative proceeding cannot be reconciled. The record shows that plaintiff's claim of inability to work was not the product of mistake or inadvertence.

Plaintiff admits he signed the application for benefits. His affidavit in opposition to the motion does not claim he did not read what he had signed. The affidavit merely seeks to leave such an implication by saying that he "looked [it] over," holding "the forms close to my eyes," and that "I now realize, if I hadn't before," that what he signed stated he became unable to work because of his disabling condition, a statement he says was "not accurate."

He apparently read the application well enough to know that he was required to notify the Social Security Administration if he went to work after he signed. His answers on his deposition make clear that he knew he had that obligation because he said that he did not advise the Social Security Administration of the income he had received from "side jobs," not on the ground that he

did not realize his obligation, but because he believed he was not required to report such "minimal" amounts as he had received. These side jobs show that he was able to read sufficiently well to do writing, complete reports, and make out bills to customers.

Moreover, his answers to the questions asked of him on the Disability Report show that he knew he was claiming that his "condition" made him "unable to work."

On the Disability Report he wrote "can't see" in the box for a response to the question, "What is your disabling condition? (Briefly explain the injury or illness that stops you from working)." The interviewer recorded his further answer as "both eyes (right eye more severe)." In his affidavit in opposition to the motion for summary judgment he does not deny that he said what she wrote either in answer to that question or to any other question. Nor does he dispute her recorded statement that she made sure the questions were asked "loud enough to be heard."

His affidavit says that he had not completed his response of "can't see" to the question as to "what is my disabling condition." He does not deny that he said "both eyes (right eye more severe"). His affidavit fails to say what else he would have written concerning how "the injury . . . stopped" him from working. Instead, he claims that he informed the interviewer that he had been laid off and had been unsuccessful in finding regular auto glass installation work and could not do locksmith work because his eyesight had grown worse.

To the question, "When did your condition finally make you stop working?" plaintiff answered "March 31, 1993." In the box asking him to "[e]xplain how your condition keeps you from working," his record response was that since being laid off in March 1993, "I have not been able to do any additional work because my vision is getting worse," and "I cannot see to do any detail work." The response, as the interviewer heard it, was not that he had been unable to find other work installing glass but that he was not able to "do any additional work" because of his worsening vision.

The fact that plaintiff told the interviewer he had been laid off could hardly have alerted her that he was saying he was able to do his old job, particularly since at the same time he claimed inability to "do any additional work." "Additional" work in common parlance means not different work but further work in addition to that already performed. "Getting worse" is fairly understood as worse than what it was when he was laid off.

Other statements in plaintiff's affidavit suggest that what he said in his application was designed to mislead the Social Security Administration. Concerned about his finances because his unemployment insurance payments had run out, he hoped for regular Social Security benefits. So he "went to Social Security not because I was disabled, or believed I might be, but rather because my wife and I needed help." He did not believe he and his wife "were at that time faced with having to seek public assistance" but "the prospect" that they would have to do so in the future was real.

When the Interviewer informed him that, because he was 61 years old, he was as yet ineligible for regular Social Security payments, and suggested that he might see whether he would be entitled to receive disability benefits, plaintiff decided to apply. His affidavit explains his thinking at the time. "Although I did not consider my vision as interfering with installing auto glass either then or later, my predicament left me with no alternative. I had to apply and did so."

Thus plaintiff, who did not think he was "disabled," felt he "had to" sign under penalty of perjury an application that asserted he was "disabled" and "unable to work" because of his disability. It is hard to conclude that he somehow misunderstood what the word "disabled" in the application meant. But even if he did, the words "unable to work" are not words of art susceptible of being misunderstood.

The disability program under the Social Security Act is not another unemployment insurance scheme. The integrity of the program depends in large part on the truthfulness of those who apply under it. That is doubtless why they are asked to sign their applications under penalty of perjury warning them of the consequences of making false statements and requiring them to affirm that the information they have provided is true. Such a requirement is some assurance that applicants will have read what they are asked to sign. Nothing in this record establishes that plaintiff failed to read what he signed or to understand what it meant to represent that he had become "unable to work because of [his] disabling condition" and was "still disabled."

The court does not reach the question of whether judicial estoppel should preclude a person from bringing suit under the Americans with Disabilities Act, 42 U.S.C. § 12111 *et seq.*, based on statements made in applying for Social Security benefits. Nor does the court address those cases where the Social Security Administration determines that a claimant has a "listed" impairment. The extent to which judicial estoppel applies to those situations is left for another day.

The judgment is affirmed.